**Helen AQUINO and Ray Aquino**

v.

**SOMMER MAID CREAMERY, INC.**

**Civ. A. No. 86–3001.**

United States District Court,
E.D. Pennsylvania.

July 26, 1988.

See also 657 F.Supp. 208.

Martha Sperling, Doylestown, Pa., for plaintiffs.

Donna Dougherty, Wayne, Pa., Charles A.J. Halpin, Philadelphia, Pa., for defendant.

FINDINGS OF FACT and
CONCLUSIONS OF LAW

SHAPIRO, District Judge.

Following a non-jury trial held July 5–8, 1988, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

*Findings of Fact*

1. Helen Aquino was hired by Sommer Maid Creamery, Inc. ("Sommer Maid") in July, 1981, as a butter packer.

2. Frank Sexton is, and at all relevant times was, President of Sommer Maid.

3. Harry Mattern is, and at all relevant times was, Plant Manager at Sommer Maid.

4. Ed Diehl is, and at all relevant times was, day shift Supervisor at Sommer Maid. Part of his job was to inspect the butter produced by machine operators.

5. At all relevant times the night shift Supervisor at Sommer Maid was Gary Cooper.

6. Helen Aquino was considered an excellent employee by Sommer Maid until the spring and summer of 1984.

7. In January, 1984, Helen Aquino was promoted to day shift machine operator.

8. At this time, Helen Aquino was one of two female machine operators at Sommer Maid. The other operator, Marjorie Cooper, was the wife of Gary Cooper, the night Supervisor.

9. In July, 1984, Helen Aquino asked to be assigned to night shift. This request was motivated, in part, by Mrs. Aquino's desire to avoid sexual harassment by day shift Supervisor, Ed Diehl.

10. Helen Aquino had already complained to Harry Mattern about Ed Diehl's sexually suggestive remarks and actions, but Harry Mattern had done nothing to remedy the situation.

11. Helen Aquino was transferred to night shift in early July, 1984 and worked one full week as a night shift machine operator prior to being hospitalized for surgery. As a night shift machine operator she was entitled to receive a $.25 per hour differential in pay.

12. On July 17, 1984, Helen Aquino underwent surgery for removal of an ovarian cyst.

13. Sommer Maid was aware that Helen Aquino had been hospitalized for surgery and had been ordered by her doctor not to work during the recuperation period.

14. Upon her return to work on August 14, 1984, Helen Aquino received a written reprimand, dated August 9, 1984 and signed by Harry Mattern, concerning her absence and attitude. Jerry Peffer, a Sommer Maid employee who had previously undergone abdominal surgery, did not receive such a reprimand.

15. Helen Aquino signed the reprimand letter to acknowledge receiving it.

16. When Helen Aquino returned to work at Sommer Maid on August 14, 1984, her position was changed from night shift machine operator to a lower paying day shift job as a packer at $6.25 an hour. No explanation was provided for this demotion.

17. As a day shift packer, Helen Aquino was again supervised by Ed Diehl.

18. After Helen Aquino returned to work on August 14, 1984, the sexual harassment by Ed Diehl continued.

19. On at least one occasion during 1984, Ed Diehl picked up Helen Aquino and placed her on a skid of boxes. This incident was observed by other Sommer Maid employees, Chris Huber and Steve Siefert.

20. On another occasion, Earl Fiebig, an independent truck driver, saw Ed Diehl touch Helen Aquino's buttocks.

21. On August 28, 1984, Helen Aquino filed complaint # E–30420 with the Pennsylvania Human Relations Commission ("PHRC"), in which she alleged sexual harassment.

22. Helen Aquino, accompanied by her husband, Ray Aquino, but without an attorney, attended a conciliation meeting at the PHRC on September 24, 1984, along with representatives of Sommer Maid including Frank Sexton, Harry Mattern, Ed Diehl and House General Counsel Charles Halpin, Jr.

23. Helen Aquino and Sommer Maid President Frank Sexton signed a Respondent–Claimant Agreement on September 24, 1984 at the PHRC.

24. In the Respondent–Claimant Agreement, Sommer Maid agreed to return Helen Aquino to her former position of machine operator at the current rate of pay, effective September 25, 1984.

25. Sommer Maid also agreed to train Helen Aquino to operate the quarter-pound machine, to reassign her to night shift on or about November 1, 1984, and to pay her $120.00.

26. Sommer Maid further agreed not to act adversely to Helen Aquino because of her complaint to the PHRC.

27. Sommer Maid paid Helen Aquino the $120.00 required by the Respondent–Claimant Agreement.

28. From September 25, 1984 until October 29, 1984, Helen Aquino worked as a machine operator on day shift.

29. During this time, Ed Diehl checked Helen Aquino's work production more frequently than that of any other employee.

30. On October 30, 1984, Helen Aquino was reassigned to night shift in accordance with the Respondent–Claimant Agreement.

31. Even after Helen Aquino was transferred to night shift, Ed Diehl would arrive at the plant early and check her butter production.

32. On many occasions, Frank Sexton was present and observed the employees in the print room where butter was packaged. Although there is no corroborating evidence that he stared at any particular employee, Helen Aquino believed he was staring at her while she worked.

33. In the early morning hours of November 27, 1984, Helen Aquino was injured at work, treated at Doylestown Hospital for corneal abrasion, and released immediately thereafter.

34. The next morning Frank Sexton called Doylestown Hospital to find out about Helen Aquino's injury.

35. Harry Mattern, on instructions from Frank Sexton, then called Helen Aquino at least twice at home, but did not speak to her.

36. Helen Aquino eventually returned Harry Mattern's call.

37. Helen Aquino told Harry Mattern that her eyesight was blurred, so she could not work that evening.

38. Harry Mattern insisted that Helen Aquino report to the plant, even if only for light duty work.

39. Helen Aquino did not report for work the evening of November 27, 1984.

40. On November 28, 1984, Frank Sexton drafted a letter to Helen Aquino concerning her absences from work since the PHRC agreement; the letter was typed and signed by Harry Mattern.

41. Helen Aquino received the letter when she reported for work on November 28, 1984.

42. On December 13, 1984, Helen Aquino injured her hand in a machine while working at Sommer Maid.

43. By this time, Helen Aquino was afraid of being fired and reluctant to seek medical attention for her injury.

44. Helen Aquino was treated for the injury at Doylestown Hospital and returned to work that evening, against her doctor's advice not to operate machinery, in order to avoid being fired.

45. On December 17, 1984, Helen Aquino had flu-like symptoms.

46. On December 17 and 18, 1984, Helen Aquino notified Sommer Maid that she would be unable to work.

47. Helen Aquino did not report for work on December 17 or 18, 1984.

48. Helen Aquino was scheduled to begin her work shift on December 17 and 18, 1984, at 11:00 p.m.

49. Helen Aquino's telephone records indicate that calls were made to Sommer Maid on December 17, 1984 at 10:58 p.m. and on December 18, 1984 at 11:00 p.m.

50. When Helen Aquino reported for work on December 19, 1984, her time card had been removed and she was unable to work her shift.

51. Gary Cooper informed her that she would be unable to work until she spoke to Harry Mattern and he instructed her to speak to Mr. Mattern the next day.

52. On the morning of December 20, 1984, Helen Aquino called Sommer Maid and spoke with Harry Mattern, who told her to report to the plant that morning for a meeting, and she agreed to do so.

53. Frank Sexton drafted and Harry Mattern signed a letter dated December 20, 1984, that was to be given to Helen Aquino at the meeting. The letter stated that Helen Aquino was suspended for three days

without pay for poor attendance and excessive absenteeism.

54. On December 20, 1984, Martha Sperling, attorney for Helen Aquino, called Harry Mattern to ascertain whether or not her client was still employed by Sommer Maid.

55. Attorney Sperling also tried to arrange the meeting between Helen Aquino and Harry Mattern.

56. Harry Mattern told Attorney Sperling that he would get back to her, but never returned the telephone call. He did not intend to deal with an attorney.

57. A meeting was not held on December 20, 1984, so Helen Aquino was not given the suspension letter.

58. On December 20, 1984, Helen Aquino prepared a second complaint with the PHRC (filed under # E–31814), that alleged retaliation.

59. By letter dated December 21, 1984, Attorney Sperling wrote the following to Harry Mattern:

As you know, I spoke with you yesterday in an attempt to clarify Mrs. Aquino's position. I am sorry that you did not return my call as you promised.

Mrs. Aquino's card has been missing from the time clock. Although she reported for work on December 19, she was not allowed to work. She will not report again as we understand that she has been dismissed.

I am somewhat surprised that Sommer Maid has not seen fit to notify Mrs. Aquino whether she is still employed or not. In any case, please contact me immediately if I am mistaken.

60. Harry Mattern did not respond to the letter, but referred the matter to Frank Sexton.

61. Helen Aquino understood that she had been fired from her job at Sommer Maid and did not return to work after December 19, 1984.

62. Sommer Maid never made any attempts to contact Helen Aquino or Attorney Sperling after December 20, 1984.

63. Helen Aquino was fired by Sommer Maid.

64. Prior to the letters to Helen Aquino, no other Sommer Maid employee was given written disciplinary warnings because of absenteeism.

65. All of Helen Aquino's absences after August 9, 1984, were the result of injuries or illness; none were pretextual or acts of malingering.

66. Chris Huber, another Sommer Maid employee, often threw butter against the wall in frustration. He never received any written disciplinary notice but once lost one-half day's pay.

67. Chris Huber occasionally left the plant even though he had been ordered to stay and work overtime; he was not given written disciplinary notices for doing so.

68. Ray Aquino is Helen Aquino's husband.

69. Ray Aquino was hired by Sommer Maid as a butter cutter in August, 1981.

70. During his employment with Sommer Maid, Ray Aquino worked in various jobs, including machine operator, trucker and unloader.

71. Ray Aquino was injured on the job at Sommer Maid on or about July 1, 1984.

72. The injury occurred when Ray Aquino slipped on oil on the dock where he was working.

73. As a result of this job-related injury, Ray Aquino filed a workers' compensation claim pursuant to 77 P.S. § 1 *et seq.*

74. Ray Aquino's injuries required hospitalization for two weeks at Doylestown Hospital.

75. Following his release from the hospital, Ray Aquino was under the care of a physician until November, 1984.

76. On September 19, 1984, Ray Aquino was examined by William Spellman, M.D., at the request of the workmen's compensation insurance carrier.

77. At this time, Ray Aquino insisted that he was unable to return to work.

78. The workmen's compensation insurance carrier authorized and effected surveillance of Ray Aquino.

79. A videotape was made of some of Ray Aquino's activities on August 30, 1984 and September 19, 1984.

80. The videotape revealed that Ray Aquino repeatedly and vigorously pulled on the cord of a lawn mower in an attempt to start the engine.

81. Ray Aquino attended the September 24, 1984, meeting at the PHRC relating to the complaint of sexual harassment by his wife Helen Aquino.

82. Sommer Maid personnel in attendance at the PHRC meeting were aware of Ray Aquino's participation in the PHRC proceedings.

83. In November, 1984, Ray Aquino called Harry Mattern to advise Sommer Maid that he was available for light duty work.

84. Neither Harry Mattern nor any other Sommer Maid employee ever called Ray Aquino back to assign him to a light duty job.

85. Light duty work was available in November, 1984; Harry Mattern had demanded that Helen Aquino come in and do light duty work when she was suffering from the corneal abrasion in November, 1984.

86. Management evaluated Dr. Spellman's report and the surveillance film sometime in November, 1984.

87. On the basis of the report and surveillance film, Sommer Maid decided to fire Ray Aquino.

88. On December 5, 1984, Ray Aquino was informed by Harry Mattern that he was terminated for malingering in violation of company policy and his contract of employment.

89. On December 14, 1984, Ray Aquino viewed the videotape accompanied by union representatives.

90. Ray Aquino was never given written reasons for his termination by Sommer Maid management.

91. By a decision in the Spring of 1988, Ray Aquino was awarded worker's compensation.

92. On May 2, 1985, Ray Aquino filed a complaint with the Equal Employment Opportunity Commission ("EEOC") (filed under # 031852863), that alleged retaliation for his participation in his wife's charges of discrimination.

93. The parties have stipulated that Helen Aquino's damages, if any, were $18,500.53.

94. The parties have stipulated that Ray Aquino's damages, if any, were $21,000.00.

### Discussion

Helen and Ray Aquino both claim discrimination by Sommer Maid because of Mrs. Aquino's previous claim of sexual harassment, particularly by Ed Diehl. The original sexual harassment charge was the subject of an earlier complaint that was terminated by a Respondent–Claimant Agreement; it is not directly in issue in the current action. Nevertheless, an employer may not retaliate against an employee because the employee engages in protected activity under Title VII. Retaliation is a separate and distinct violation of Title VII.

Plaintiff establishes a *prima facie* case of retaliation if plaintiff shows: "(1) that she engaged in protected activity, which was known by the alleged retaliator; (2) that an adverse action was taken against her; and (3) that there was a causal connection between the protected activity and the retaliation." *Gemmell v. Meese*, 655 F.Supp. 577, 583 (E.D.Pa.1986). To show the necessary connection, plaintiff must present sufficient evidence to create an inference that the protected activity was the likely reason for the adverse actions. *See Id.* at 583. After a *prima facie* case has been established, the burden of production shifts to defendant to articulate legitimate, non-discriminatory reasons for its actions. Upon such a showing, the burden of production shifts back to plaintiff to show that defendant's reasons were pretextual and the true motives were illegal. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Plaintiff may show that the proffered reason was pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer [than the articulated reason] or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The ultimate burden of persuasion remains on plaintiff, even though the burden of production may shift to defendant.

■ Helen Aquino established a *prima facie* case of retaliation. Her complaint to the PHRC was a protected activity under Title VII. Sommer Maid knew of this activity because it participated in the PHRC meeting and signed the Respondent–Claimant Agreement. Sommer Maid took adverse action against Helen Aquino during the fall of 1984 by subjecting her to close job scrutiny, unique disciplinary procedures, and termination of her employment. The evidence established that Helen Aquino's PHRC complaint was the cause of the adverse actions taken against her.

■ Sommer Maid's articulated reason for terminating Mrs. Aquino—her absenteeism—was a pretext for unlawful retaliation. Mrs. Aquino has proven by a preponderance of the evidence that retaliation more likely motivated the actions taken against her than did her absences. In addition, Sommer Maid's asserted reason for its actions is unworthy of credence. After returning from surgery and receiving a warning letter, Helen Aquino was absent six times before being fired. The first such absence occurred because she was attending the PHRC meeting. Thereafter, all of her absences were for legitimate, medical reasons.

After the PHRC meeting, her behavior was scrutinized more than that of any other employee. She received unprecedented written disciplinary warnings. When she was injured on November 27, 1984, she was called by Harry Mattern, upon instructions of Frank Sexton, and ordered to report for work despite an eye injury. All of these actions showed a concerted effort by Sommer Maid to force Mrs. Aquino to leave "voluntarily" or to find an excuse to terminate her employment.

In reaching its conclusions about Mrs. Aquino's claim, the court was influenced by the credibility of the persons testifying at trial. The testimony of Helen Aquino was vague and confused on some minor matters by reason of her fragile emotional state. But, on major matters her testimony had the ring of truth and was corroborated by disinterested third-party witnesses. In contrast, the defense witnesses, all officers or present employees of Sommer Maid except for Gary and Marjorie Cooper, gave contradictory, incredible testimony that convinced the court more than the testimony of Helen Aquino that she was telling the truth. Ed Diehl and Harry Mattern's manner of testifying and the difference in the qualities of response to plaintiff and defense counsel did not convince the court of their credibility. The company President, Frank Sexton, was direct and forceful in his testimony, but unconvincing on the key issue regarding the real reason for Helen Aquino's termination in December, 1984.

■ Ray Aquino also established a *prima facie* case of retaliation. He supported his wife's PHRC complaint by attending the September 24, 1984 meeting. Within three months of the meeting, he was fired by Sommer Maid. This temporal closeness between the meeting and Ray Aquino's termination create an inference of retaliation.

■ The asserted reason for Ray Aquino's termination was malingering. The court finds credible the testimony that Sommer Maid *believed* Ray Aquino was a malingerer, even if he in fact was not malingering. Ray Aquino has not met his burden of proving that the reason proffered by Sommer Maid was pretextual.

### Conclusions of Law

1. The court has jurisdiction under 28 U.S.C. § 1331 because the cause of action arises under 42 U.S.C. § 2000e, *et seq.*

2. Sommer Maid retaliated against Helen Aquino for filing a complaint with the PHRC and said retaliation was unlawful.

3. Sommer Maid did not retaliate against Ray Aquino because of his participation in the PHRC meeting about his wife's complaint.

4. Damages are awarded in favor of Helen Aquino in the amount of $18,500.53.